IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **AZURE MIDSTREAM** | § | **Case No. 17-30461 (DRJ)** |
| **PARTNERS, LP**, *et al.*, | § | |
| | § | **Jointly Administered** |
| | § | |
| Debtors.[1] | § | |

**EXPEDITED MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363, 365, AND 503 AND FED. R. BANKR. P. 2002, 6004, AND 6006 FOR ENTRY OF (I) ORDER APPROVING (A) BID PROCEDURES, (B) PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND RELATED NOTICES, (C) NOTICE OF AUCTION AND SALE HEARING, AND (D) RELATED RELIEF AND (II) ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND RELATED CURE AMOUNTS, AND (C) GRANTING RELATED RELIEF**

---

**THERE WILL BE A HEARING ON THIS MOTION ON FEBRUARY 23, 2017 AT 1:30 P.M. PREVAILING CENTRAL TIME IN COURTROOM 400, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EXPEDITED RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EXPEDITED BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EXPEDITED CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Azure Midstream Partners, LP (7595), Azure ETG, LLC (3388), Azure Holdings GP, LLC (0537), Azure Midstream Partners GP, LLC (8089), Azure TGG, LLC (6233), Marlin G&P I, LLC (6073), Marlin Logistics, LLC (8460), Marlin Midstream Finance Corp. (0130), Marlin Midstream, LLC (2587), Murvaul Gas Gathering, LLC (0826), Talco Midstream Assets, Ltd. (7004), and Turkey Creek Pipeline, LLC (1161).  The Debtors' principal offices are located at 12377 Merit Drive, Suite 300, Dallas, Texas 75251.

Azure Midstream Partners, LP and its subsidiaries and certain affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

## Relief Requested

1.      Pursuant to sections 105, 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors hereby move the Court for the entry of an order (the "**Bid Procedures Order**"), substantially in the form annexed hereto as **Exhibit A**: (i) approving the bid procedures (the "**Bid Procedures**," substantially in the form annexed to the Bid Procedures Order as **Exhibit 1**) for the sale of substantially all of the Debtors' assets (the "**Assets**"); (ii) approving the procedures for the assumption, assignment, and sale of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**"); (iii) approving the Debtors' selection of the Stalking Horse Purchaser (as defined herein) and the provision of Bid Protections to the Stalking Horse Purchaser; (iv) establishing dates for (a) an auction if the Debtors receive one or more timely and acceptable Qualified Bids (as defined herein) (the "**Auction**") and (b) a final hearing (the "**Sale Hearing**") to approve the sale of the Assets (the "**Sale Transaction**"); and (v) approving the form and manner of notice of the Auction, Sale Hearing, and the Assumption and Assignment Procedures.  A form of notice of assumption and assignment is annexed to the Bid Procedures Order as **Exhibit 2**.  A form of notice of the Auction and Sale Hearing is annexed to the Bid Procedures Order as **Exhibit 3**.

2.      The Debtors also move the Court, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, for the entry of an order (the "**Sale Order**"), a form of which will be filed with the Court in advance of the Sale Hearing, (i) approving the sale of substantially all of the Assets free and clear of liens, claims,

encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, (ii) approving the assumption, assignment, and sale of certain executory contracts and unexpired leases pursuant to sections 363 and 365 of the Bankruptcy Code, and related cure amounts, and (iii) granting related relief.

### Jurisdiction

3.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

4.     On January 30, 2017 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

5.     The Debtors are a publicly-traded master limited partnership organized for the purpose of acquiring, developing, and operating midstream energy assets relating to (i) the gathering, transport, and processing of liquid natural gas, and (ii) crude oil logistics services. The Debtors consist of eight operating entities, including Azure Midstream Partners, LP ("**Azure**") and Azure Midstream Partners GP, LLC ("**Azure General Partners**"), and four non-operating entities (collectively, with the operating entities, the "**Company**").  Approximately 97.7% of all outstanding limited partner interests in Azure are publicly held.  Non-Debtor affiliate Azure Midstream Energy LLC, which is privately held ("**AME**"), owns all the general partnership interests of Azure General Partner.  AME also owns midstream energy assets, independent of its interests in Azure General Partner, either directly or through its affiliates (AME and such non-Debtor affiliates, collectively, the "**Non-Debtor Affiliate Company**").

6.     Additional information regarding the circumstances leading to the commencement of these chapter 11 cases and information regarding the Debtors' business and capital structure is set forth in the *Declaration of Ed Mosley in Support of the Debtors' Chapter 11 Petitions and Related Requests for Relief* [Dkt. No. 15] (the "**Mosley Declaration**").

### Prepetition Marketing and Sale Process

7.     The Debtors' pursuit of a going concern sale transaction began in 2015, following a thorough evaluation of all options available to the Debtors.  On November 23, 2015, the Debtors retained Evercore Group LLC ("**Evercore**") to serve as their investment banker and to market substantially all of the Assets.   Additional information regarding Evercore's involvement and the Debtors' marketing and sale process is set forth in the *Declaration of Robert Pacha* (the "**Evercore Declaration**"), which is attached hereto as **Exhibit B**.

8.     In late 2015 and continuing into 2016, Evercore, along with certain of the Debtors' other advisors, advised on a dual-track process to explore options for a potential sale of the Debtors or a preferred equity investment in the Debtors.  As part of the sale process, the Debtors' advisors contacted 20 potential transaction partners, including strategic buyers (*i.e.*, companies already operating in the industry) and financial buyers (such as private equity firms) to gauge interest in a potential transaction.  *See* Evercore Decl. ¶ 9.  While the Debtors received four  proposals for a potential sale from the initial marketing period, they received no proposals for a preferred equity investment.  Of the sale proposals received, two proposals implied values for the Debtors below prepetition debt levels, another proposal contemplated a joint venture with no cash consideration, and the final proposal was to acquire only the Debtors' Panola processing plant.[2]  *See id.*

9.     Subsequently, Evercore and the Debtors continued discussions with private equity firms and other parties potentially interested in an investment in or purchase of the

---

[2] The Debtors proceeded with the sale of the Panola facility.

Debtors' Assets and engaged in a new marketing process for the Assets.  After considering all options, the Debtors' advisors, in consultation with the advisors to Wells Fargo Bank, N.A., as administrative agent (the "**Administrative Agent**"), decided to focus their efforts on the pursuit of the Sale Transaction as opposed to an equity investment.  Specifically, Evercore has engaged with over 70 strategic and financial counterparts, including MLPs, public midstream C-Corporations, privately-held midstream oil and gas companies, and potential financial sponsors, which parties were identified based on Evercore's experience in the industry.  During this process, parties who executed confidentiality agreements were provided with a Confidential Information Memorandum containing significant diligence and other confidential information about the Debtors' businesses.  Twenty-five different parties ultimately executed confidentiality agreements.  *See* Evercore Decl. ¶ 10.  As a result of Evercore's extensive marketing efforts, the Debtors received 11 indications of interest on or about December 15, 2016 for either an acquisition all or a portion of the Debtors' Assets or for refinancing a portion of the Debtors' prepetition secured debt.  From those indications of interest, the Debtors qualified seven bidders to move to a second-stage process beginning in January 2017.  Those bidders moving to the second stage were provided with access to a second data room with additional information about the Assets.  Bidders moving to the second stage were also provided access to management through management presentations, and were provided copies of the form of Stalking Horse Agreement.  Management presentations were conducted for five of the bidders.  The Debtors received three second-stage bids on January 26, 2017.  Additionally, one joint venture proposal was received on January 26, 2017 with respect to the construction of a new pipeline and related assets and the entry into a transportation services agreement.  *See* Evercore Decl. ¶ 11.  In evaluating the proposals, the Debtors and Evercore analyzed, among other things: (i) the consideration offered by each potential buyer, (ii) the conditions to be imposed by each potential buyer, including the conditions to closing, (iii) the potential buyer's ability to close a transaction,

(iv) the proposal's impact on the Debtors' secured lenders and trade creditors; and (v) the proposals' treatment of and effect on the Debtors' employees.

10.     After extensive deliberations with their advisors and separate negotiations with the potential bidders that participated in the second stage of the process, the Debtors have elected to proceed with the bid submitted by M5 Midstream LLC (the "**Stalking Horse Purchaser**") as the highest or otherwise best bid received for the Assets, subject to the Debtors' receipt of any higher or otherwise better bids at an Auction to be held on March 10, 2017.

11.     Absent the approval of the Bid Procedures, a Sale Transaction, and related relief contemplated by this Motion, the Debtors believe they will be unable to realize the maximum value of the Assets for the benefits of all stakeholders.

## **Proposed Sale Transaction**

*The Stalking Horse Agreement*

12.     In advance of the Petition Date, the Debtors and the Stalking Horse Purchaser negotiated an asset purchase agreement (the "**Stalking Horse Agreement**"), a copy of which is annexed hereto as **Exhibit C**, which represents a binding bid for substantially all of the Assets.  The total consideration to be realized by the Debtors is approximately $151,100,000, subject to certain adjustments (the "**Stalking Horse Bid**").  Certain terms of the Stalking Horse Agreement are described below:

- **Acquired Assets**.  The assets to be acquired will include:

  o All pipelines, pipeline systems, flowlines, and gathering and processing systems described in the Stalking Horse Agreement and all other pipelines, pipeline systems, flowlines, compression facilities and gathering and processing systems (whether operating, being build or idle) of the Debtors located in Panola, Gregg, Harrison, Angelina, Shelby, San Augustine, Nacogdoches and Rusk Counties, Texas and De Soto and Caddo Parishes, Louisiana, together with all equipment, machinery, fixtures, power lines, and other personal, movable and mixed property of the Debtors that is located at or in the vicinity of such pipelines, pipeline systems, flowlines and gathering and processing systems or used in

connection with such pipelines, pipeline systems, flowlines, compression facilities and fathering and processing systems.

All processing and treating plants and other plants of the Debtors located in Panola, Gregg, Harrison, Angelina, Shelby, San Augustine, Nacogdoches and Rusk Counties, Texas and De Soto and Caddo Parishes, Louisiana together with all equipment, machinery, fixtures, power lines, and other personal, movable and mixed property of the Debtors that is located at or in the vicinity of such processing and treating plants or other plants

o  All the salt waste disposal wells of the Debtors located in Harrison County, Texas, together with all equipment, machinery, fixtures, power lines and other personal, movable and mixed property of the Debtors that is located at or in the vicinity of such salt water disposal wells.

o  All rights-of-way, easements, real rights, licenses, servitudes, permits, privileges and leases (surface and subsurface), fee interests and real property interests owned or held by the Debtors or hereinafter acquired by the Debtors prior to the closing.

•  **Acquired Liabilities**:  The Stalking Horse Purchaser will assume and agree to be responsible for the payment, performance or discharge of the following liabilities of the Debtors:

o  The obligations of the Debtors which are required to be performed, and which accrue, after the closing date under any assigned contracts and assigned permits (but not any liabilities of the Debtors in respect of (i) a breach of or default under such contracts or permits arising in or related to the period prior to the closing, or (ii) any violation of law by the Debtors);

o  All liabilities to the extent resulting from or arising out of the ownership or operation of the Assets by the Stalking Horse Purchaser after the closing date;

o  Any liabilities with respect to property taxes allocated to the Buyer; and

o  All liabilities set forth on Schedule 2.3(d) of the Stalking Horse Agreement.

•  **Preferential Purchase Rights**.  If a preferential purchase right[3] is exercised by the holder thereof prior to the closing (i) such assets and the related contract shall be excluded from the Assets at the closing, (ii) such

---

[3] Certain persons may hold approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights in certain of the Debtors' Assets.

assets and related contract shall be deemed to be excluded assets for the purposes of the Stalking Horse Agreement, (iii) the purchase price shall be reduced by an amount equal to the cash proceeds received or to be received by the Debtors with respect to such assets and related contract, and (iv) the Debtors shall be entitled to retain all proceeds received for such assets and the related contract from the party exercising such preferential purchase right.

- **Bankruptcy Approval**.  The obligation of the Stalking Horse Purchaser to consummate the transactions contemplated by the Stalking Horse Agreement is subject to the Bankruptcy Court having entered the Sale Order and the Sale Order being in full force and effect and not subject to any stay pending appeal.

- **Break-Up Fee and Expense Reimbursement**.  The Stalking Horse Purchaser shall be entitled to a Break-Up fee equal to 3% of the Purchase Price and an Expense Reimbursement of up to $1,000,000.

- **Back-Up Bidder**.  In the event that the Stalking Horse Purchaser is not the winning bidder at the Auction, the Stalking Horse Purchaser agrees to serve as Back-Up Bidder for up to 30 days following the commencement of the Auction.

- **Bankruptcy Milestones**.  The Stalking Horse Agreement contains the following milestones:

  o Within one (1) day after the execution date, the Debtors shall have filed the Motion with the Bankruptcy Court;

  o The Debtors shall use commercially reasonable efforts to obtain entry of the Bid Procedures Order at the hearing scheduled for February 23, 2017, and in no event later than 21 days after the execution date;

  o The Debtors shall use commercially reasonable efforts to obtain entry of the Sale Order on or before March 16, 2017, and in no event later than 50 days after the execution date; and

  o Prior to any filing by the Debtors, and as early in advance as is practicable, the Debtors shall provide the Stalking Horse Purchaser with a reasonable opportunity to review and comment on all pleadings, motions, notices, statements, schedules, applications, reports and other material papers to be filed by the Debtors in the Bankruptcy Court to the extent related to the Sale Transaction.

- **Sale Closing**.  The closing shall take play within three (3) business days after the Bankruptcy Court's entry of the Sale Order and the satisfaction or waiver of any of the conditions set forth in the Stalking Horse Agreement.

8

- **Records Retention**.   The Debtors and the Stalking Horse Purchaser agree that each of them shall use commercially reasonable efforts to preserve and keep the records held by them relating to the Assets and any excluded assets for a period of five (5) years from the closing date and shall make such records and personnel available to the other as may be reasonably required by such party.   In the event the Debtors or the Stalking Horse Purchaser wish to destroy (or permit to be destroyed) such records after that time, such party shall first give 45 days prior written notice to the other, and such other party shall have the right, at its option and expense, upon prior written notice given to such party within 45 day period, to take possession or make copies of the records within 45 days after the date of such notice.

13.     The Bid Procedures provide for standard bid protections, such as initial overbid amounts and subsequent bidding increments.   The Stalking Horse Agreement also includes provisions for the payment of a break-up fee in the amount of 3% of the purchase price (the "**Break-Up Fee**") and expense reimbursement capped at $1,000,000 (the "**Expense Reimbursement**"), as administrative expenses, upon the Debtors' consummation of a transaction with another bidder.  The Bid Procedures also contemplate an initial overbid amount of $1,000,000 and that subsequent overbids shall be in the amount of $500,000.

14.     The Stalking Horse Purchaser has agreed to hold open its binding offer to purchase the Assets for 30 days after the commencement of the Auction in the event the Stalking Horse Bid is topped at the Auction and is designated as the Back-Up Bidder and the winning bid is not consummated.

15.     The Stalking Horse Agreement includes various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Purchaser, as well as certain conditions to closing and rights of termination.  The transaction contemplated by the Stalking Horse Agreement is subject to approval by the Bankruptcy Court and entry of the Bid Procedures Order and the Sale Order.

16.     The Stalking Horse Purchaser is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common

identity of incorporators, directors, or controlling shareholders exists between the Stalking Horse Purchaser and the Debtors.

17.     Ample authority exists for approval of the sale envisioned by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  *See, e.g.*, *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").  Bankruptcy courts reviewing a proposed sale of assets should give deference to the business judgment of a debtor when it deems the sale to be appropriate.  *See Esposito v. Title Ins. Co. (In re Fernwood Mkts.)*, 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).  The orderly sale of the Assets is critical to preserving and realizing their value and, in turn, to maximize recoveries for the Debtors' economic stakeholders.  Pursuing the Stalking Horse Agreement and the Sale Transaction represents a reasonable exercise of the Debtors' business judgment and is in the best interest of all parties.

18.     As described in further detail below, the notice that the Debtors propose to provide is more than adequate and reasonable.  Such notice will ensure that actual notice of the Auction, Sale Hearing, and Sale Transaction will be provided to all known creditors of the Debtors, in addition to notice by publication.

19.     The Debtors believe that the purchase price set forth in the Stalking Horse Agreement is fair and reasonable, and the Court and parties in interest will be assured at the Sale Hearing—after an extended diligence period and the prepetition marketing by the Debtors' advisors—that the Debtors will have selected the highest or otherwise best offer for the Assets.

*Break-Up Fee, Expense Reimbursement, and Other Bid Protections*

20.     The Bid Procedures contain certain bid protections for the Stalking Horse Purchaser, such as an initial overbid requirement and subsequent bidding increments.[4]   The Stalking Horse Agreement contains additional bid protections; namely, the provision of a Break-Up Fee and Expense Reimbursement, which are payable in the event that a higher or otherwise better competing bid in respect of the Assets is consummated and under certain other limited circumstances (collectively, such Break-Up Fee and Expense Reimbursement, together with the initial and subsequent bid increments, the "**Bid Protections**").

21.     Approval of bid protections in the form of break-up fees and expense reimbursements to be paid as an administrative expense claim in connection with a stalking horse bid for a sale of assets pursuant to section 363 of the Bankruptcy Code has become a widely-accepted practice in chapter 11 cases.  These protections, individually, and collectively, were a material inducement for, and condition of, the Stalking Horse Purchaser's entry into the Stalking Horse Agreement.  The Stalking Horse Purchaser is unwilling to commit to hold open its offer under the terms of the Stalking Horse Agreement unless assured of payment of the Break-Up Fee and Expense Reimbursement under the conditions set forth in the Stalking Horse Agreement. The Break-Up Fee and Expense Reimbursement promote more competitive bidding by inducing the Stalking Horse Purchaser to hold its offer open as a minimum or floor bid on which other potential bidders—and the Debtors—can rely.  The Stalking Horse Bid increases the likelihood that the price at which the Assets are sold will reflect their true worth.  Such protections have

---

[4] Subject to the terms of the Stalking Horse Asset Purchase agreement, the Debtors retain the right to alter or amend the Bid Procedures at any time prior to, or during, the Auction.

been approved by a number of other courts around the country.  *See, e.g.*, *In re Luca Int'l Grp., LLC,* 15-34221 (DRJ) (Bankr. S.D. Tex. Feb. 1, 2016) (approving break-up fees); *In re RAAM Global Energy Co.*, 15-35616 (MI) (Bankr. S.D. Tex. Dec. 20, 2015) (approving expense reimbursement); *In re The Greater Atlantic & Pacific Tea Co.,* Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (approving break-up fees and expense reimbursements); *In re GMZ Resources, Inc.*, Case No. 13-11456 (SAH) (Bankr. W.D. Okla. June 11, 2013) (approving an uncapped expenses reimbursement); and *In re Finlay Enters., Inc., et al.* Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fees).

22.     Courts have held that break-up fees should be approved so long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014).  The Debtors submit that the Break-Up Fee and Expense Reimbursement should be approved under each of these factors.  First, the Break-Up Fee and the Expense Reimbursement are the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Purchaser.  Second, the Debtors believe, based on their business judgment, that the Break-Up Fee and Expense Reimbursement will enable them to maximize the value of the Assets without chilling bidding.  The Break-Up Fee and Expense Reimbursement were a material inducement for, and a condition of, the Stalking Horse Purchaser's agreement to enter into the Stalking Horse Agreement, which in turn assures the Debtors of a sale to a committed bidder at a price that the Debtors believe is fair and reasonable, while providing the opportunity that the Debtors could receive a higher or otherwise better offer at the Auction.  Third, the Debtors believe that the Break-Up Fee and Expense Reimbursement are reasonable and appropriate relative to the size, nature and complexity of the transaction and the commitments made and resources expended by the Stalking Horse Purchaser.  Further,

Bankruptcy courts have approved bidding incentives similar to the ones contemplated in the Stalking Horse Agreement under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  "Furthermore, it is not uncommon for an agreement to provide for payment of the stalking horse's expenses in addition to a break-up fee."  *In re Texas Rangers Baseball Partners*, 431 B.R. 706, 715 (Bankr. N.D. Tex. 2010).

23.     The Break-Up Fee and Expense Reimbursement are fair and reasonable in amount under the circumstances and there is ample precedent for approving (i) a Break-Up Fee of 3% and an Expense Reimbursement of up to $1,000,000.  *See In re Hostess Brands, Inc.* Case No. 12-22052 (Bankr. S.D.N.Y. 2013) (break-up fee equal to 3.5%); *In re LTV Steel Co., Inc.*, Case No. 00-43866 (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.5%); *In re RAAM Global Energy*, Case No. 15-35615 (Bankr. S.D. Tex. Dec. 20, 2015) (approving $1,000,000 expense reimbursement); *In re Ormet Corp.*, Case No. 13-10334 (MFW) (Bankr. D. Del. Mar. 21, 2013) (same); *In re Friendly Ice Cream Corp.*, Case No. 11-13167 (KG) (Bankr. D. Del. Nov. 3, 2011) (same).

24.     The foregoing bid protections will not deter or chill bidding and are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of the Assets for the benefit of their estates and stakeholders.  Accordingly, the Debtors respectfully request that the Bid Protections be approved.

*Bid Procedures*

25.     The Debtors' proposed Bid Procedures are designed to maximize value for the Debtors' estates in connection with the Sale Transaction and provide an opportunity for all interested parties to submit offers for all or a portion of the Debtors' assets.  The Bid Procedures describe, among other things, the manner in which potential bidders and bids become

"qualified," the procedures for receipt and negotiation of bids received, the conduct of the Auction, if any, the selection and approval of any successful bidders (the "**Successful Bidders**"), and related deadlines.  The Bid Procedures afford the Debtors a sufficient opportunity to pursue a robust sale process that will maximize the value of the Assets for the benefit of their estates and all stakeholders.

26.     Certain of the key terms of the Bid Procedures are highlighted below:

a.     **Bid Deadline**:  Any person or entity interest in participating in the Auction must submit a Qualified Bid (as defined in the Bid Procedures) on or before **March 6, 2017 at 5:00 p.m. (prevailing Central Time)** in writing, to (i) the restructuring attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Esq., Robert J. Lemons, Esq., and Charles M. Persons, Esq.), (ii) corporate counsel for the Debtors, Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201 (Attn: Michael Saslaw, Esq. and Bradley Foxman, Esq.), and (iii) counsel to the Administrative Agent, Baker & McKenzie LLP, 452 Fifth Avenue, New York, NY 10018 (Attn: James Donnell, Esq., Peter Goodman, Esq., and Frank Grese, Esq.).  The Debtors may extend the Bid Deadline, in consultation with the advisors to the Administrative Agent, and with the consent of the Stalking Horse Purchaser, but shall promptly notify all potential bidders of any such extension.

b.     **Auction Qualification Process**:  To be eligible to participate in the Auction, each potential bidder must be determined by the Debtors to satisfy each of the conditions set forth below:

i.     Each potential bidder must submit a bid in writing.

ii.     The proposed bid must identify (i) the Assets, or the portion thereof, to be purchased (ii) the liabilities, if any, to be assumed, including any debt to be assumed, and (iii) the cash purchase price of the bid.  The cash purchase price must exceed the Stalking Horse bid, plus the Break-Up Fee, plus the Expense Reimbursement, plus an initial overbid amount of $1,000,000 (each, such bid an "**Initial Topping Bid**").

iii.     The proposed bid must include a proposed list of desired Assumed Contracts (as defined herein) and proposed adequate assurance of future performance under such Assumed Contracts.

iv.     **Confidentiality Agreement**.  Each potential bidder must have executed a valid confidentiality or non-disclosure agreement, in form and substance satisfactory to the Debtors.

v.      **Identification of Bidder**:  Each potential bidder must fully disclose the legal identity of each entity that will be bidding for the applicable Assets or otherwise participating in connection with such bid.

vi.     **Conditions of Bid**.  Each potential bidder must fully disclose the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known potential bidder or Qualified Bidder, and/or any officer or director of the foregoing.

vii.    **Modified Agreement**:  Each potential bidder must submit to the Debtors an irrevocable offer in the form of a Modified Asset Purchase Agreement (as defined in the Bid Procedures), including all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by the Debtors) and a marked copy of the Modified Asset Purchase Agreement reflecting the differences between the Modified Asset Purchase Agreement and the Stalking Horse Agreement.

viii.   **Proof of Financial Ability to Perform**:  Each potential bidder must state that it is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement, detail the source(s) of funds that will be used to consummate the transactions, and include satisfactory evidence of committed financing or other financial ability to consummate the transactions in a timely manner.

ix.     Each potential bidder must expressly acknowledge and represent that the potential bidder (i) has had an opportunity to conduct any and all due diligence regarding the business and assets of the Debtors prior to making its bid and (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, provided in connection therewith, except as expressly stated in the representations and warranties contained in the Modified Asset Purchase Agreement ultimately accepted and executed by the Debtors.

x.        Bids may not contain any financing contingencies of any kind.

xi.       Bids may not contain any condition to closing of the transaction on the receipt of any third-party approvals (excluding required Court approval and any required governmental and/or regulatory approval, if any).

xii.      Bids must include evidence of authorization and approval from the potential bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Sale Transaction.

xiii.    The bids must state the specific person(s) whom the Debtors' investment bankers, Evercore Group LLC, should contact in the event that the Debtors have any questions or wish to discuss the Modified Asset Purchase Agreement.

xiv.    **Good Faith Deposit**: Each potential bidder must provide a good faith deposit (the "**Good Faith Deposit**") in the form of a certified or bank check (or other form acceptable to the Debtors in their sole and absolute discretion) payable to the order of Azure Midstream Partners, LP in an amount equal to ten (10%) percent of the purchase price offered to purchase the Assets. All Good Faith Deposits shall be held in a segregated account by the Debtors or in an escrow account established by the Debtors pursuant to an escrow agreement mutually agreed to by the parties thereto, until no later than five (5) days after the Sale Hearing and thereafter returned to the respective bidders in accordance with the Bid Procedures, unless the bidder has been selected as the Successful Bidder or the Back-Up Bidder (as defined below).

c.    **Qualified Bidder**:  The Debtors shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than **March 8, 2017 at 5:00 p.m. (prevailing Central Time)**. The Debtors will consider bids for less than all or substantially all, but not less than a material portion of, the Assets. Qualified Bids must be made in all cash and set forth what, if any debt or other liabilities will be assumed by the bidder. With the goal and primary purpose of selling substantially all of the Assets, the Debtors, in consultation with the advisors to the Administrative Agent, may accept as a single Qualified Bid, multiple bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid. The Debtors, in consultation with the advisors to the Administrative Agent, may permit

otherwise Qualified Bidders who submitted bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of such multiple bids, to participate in the Auction and to submit higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Assets, as part of such a single Qualifying Bid for overbid purposes.  The Debtors retain the right to amend the conditions precedent to being a Qualified Bidder at any time in their sole discretion.  The Stalking Horse Purchaser shall be a Qualified Bidder for all purposes without the submission of any additional documentation.

d.     **Auction, Auction Procedures, and Overbids**:  In the event that the Debtors receive one or more timely Qualified Bids with an acceptable purchase price, the Debtors shall conduct the Auction. The Auction, if required, will be conducted at the offices of Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite 1700, Houston, Texas 77002 on **March 10, 2017 at 9:00 a.m. (prevailing Central Time)**, or such other time and location as designated by the Debtors in a notice to all Qualified Bidders. The Debtors shall have the right to conduct any number of Auctions on such date to accommodate Qualified Bids for certain, but less than all, of the Debtors' Assets, including Assets not acquired by the Stalking Horse Purchaser, if the Debtors determine, in their business judgment, and in consultation with the advisors to the Administrative Agent, that such process would be in the best interests of the Debtors' estates.  The Debtors reserve the right, in their reasonable discretion, and subject to the exercise of their business judgment, and in consultation with the advisors to the Administrative Agent, to adjourn or cancel the Auction.

i.       Each Qualified Bidder shall appear in person or through a duly authorized representative at and participate in the Auction.  Only representatives (including counsel) of the Debtors, Qualified Bidders, and the Administrative Agent shall be entitled to be present at the Auction, and only Qualified Bidders shall be entitled to make any subsequent bids at the Auction.  Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.  Any and all other creditors interested in attending the Auction must provide the Debtors with notice of their intent to attend the Auction no later than ten (10) days before the Auction by sending a fax or e-mail to counsel for the Debtors, Weil, Gotshal & Manges LLP (Attn: Gary T. Holtzer, Esq., Robert J. Lemons, Esq., and Charles M. Persons, Esq.).  The Debtors may object to and request a hearing regarding the attendance of any particular creditor at the Auction.

ii.    Bidding shall commence at the initial highest bid, which the Debtors shall announce prior to the Auction (such bid, the "**Opening Bid**"). The Opening Bid may be an Initial Topping Bid or the Stalking Horse Bid. Qualified Bidders may then submit successive bids higher than the previous bid, based on an increase from the Opening Bid, in increments of $500,000. The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment, to announce reductions or increases in minimum incremental bids at any time during the Auction. All Qualified Bidders shall have the right to submit additional bids and make additional modifications to their respective Modified Asset Purchase Agreements, as applicable, at the Auction to improve such bids. The Auction may include individual negotiations with the Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders; provided, however, that there shall be no private communications during the Auction between Qualified Bidders who are actively bidding.

iii.    The Auction among Qualified Bidders shall continue according to these procedures until the Debtors determine, and subject to Court approval, that the Debtors have received Successful Bid(s). In making this decision, the Debtors may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidders' ability to close a given transaction, the proposed timing thereof, and rights of such Qualified Bidder and the Debtors with respect to the termination thereof, the number, type and nature of any changes reflected in the Modified Asset Purchase Agreement requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder(s) submitting such Successful Bid(s) for the Assets shall become the Successful Bidder(s) and shall have such rights and responsibilities of a purchaser, as set forth in the Modified Asset Purchase Agreement or Asset Purchase Agreement, as applicable.

iv.    On or before **March 11, 2017**, the Debtors shall cause the results of the Auction, including a copy of the Successful Bid(s), the identity of any Successful Bidders (as defined in the Bid Procedures), and each Successful Bidder's proposed form of adequate assurance of future performance, to be published on the website of KCC at http://www.kccllc.net/azuremlp.

v.    The Court will conduct a hearing on **March 15, 2017 at 10:30 a.m.** to authorize the Debtors to consummate the

Sale Transaction with the Successful Bidder. All Qualified Bidders at the Auction shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction.

e. **Back-Up Bidder**: If an Auction is conducted, the Qualified Bidder(s) with the next highest or otherwise best Qualified Bid for the Assets at the Auction (the "**Back-Up Bid**") shall be required to serve as the back-up bidder(s) (the "**Back-Up Bidder**") for such Assets and keep such Back-Up Bid(s) open and irrevocable until the first to occur of (i) thirty (30) days after the completion of the Auction, (ii) consummation of the transaction with the Successful Bidder, or (iii) the Back-Up Bidder's receipt of notice from the Debtors of the release by the Debtors of the Back-Up Bidder's obligations. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or failure to perform on the part of such Successful Bidder or otherwise, the Back-Up Bidder will be automatically deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

f. **Alteration of Procedures and Reservation of Rights**: The Debtors reserve the right, in their reasonable discretion, and subject to the exercise of their business judgment in accordance with their fiduciary duties, and in consultation with the advisors to the Administrative Agent, to alter or terminate the Bid Procedures, to waive terms and conditions set forth herein with respect to all Potential Bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, provide reasonable accommodations to Potential Bidders with respect to such terms, conditions, and deadlines of the Bid Procedures and bid process to promote further bids by such bidders and/or to terminate discussions with any and all prospective bidders and investors (except the Successful Bidder(s)) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with the Bid Procedures; provided further that the Debtors' exercise of their discretion in evaluating bids and administering the Bid Procedures and the bid process does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions and protections set forth in the Bid Procedures.

27. The Debtors believe that the Bid Procedures are fair and reasonable and will ensure that the Auction, if necessary, will yield the maximum value for the Debtors' estates and constituents. The Bid Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bid(s) are in the best interests

of the Debtors and their economic stakeholders.  The Bid Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids (as such terms are defined in the Bid Procedures).  In addition, the Bid Procedures are prudently designed to stimulate bidding on as many of the Assets as possible by (i) permitting the Debtors to consider bids for less than all or substantially all, but not less than a material portion of, the Assets and (ii) to accept as a single Qualified Bid, multiple bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid.

28.     Accordingly, approval of the Bid Procedures, including the dates established therein for the Auction and the Sale Hearing, is warranted, and the Debtors respectfully request the Court approve them in their entirety.

### Approval of Assumption and Assignment Procedures

29.     To facilitate the Sale Transaction, the Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume and assign such contracts or leases:

a.     **Notice of Assumption and Assignment**:  No later than **February 24, 2017**, the Debtors shall file with the Court and serve via first class mail on all counterparties to any of the Debtors' executory contracts and unexpired leases (together, the "**Contracts**") and all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "**Contract Notice Parties**") a notice of assumption, assignment, and sale, substantially in the form of the Notice of Assumption and Assignment attached to the Bid Procedures Order as **Exhibit 2** listing all of the Contracts that the Stalking Horse Purchaser proposes to be assumed, assigned, and sold to it in connection with the Sale Transaction (each, an "**Assumed Contract**"), which Notice of Assumption and Assignment shall include the Debtors' calculation of the amount necessary to cure all monetary defaults (the "**Cure Costs**") for each Assumed Contract.

b.     **Objections to Assumption and Assignment**:  Any counterparty to an Assumed Contract that objects to the assumption of its Assumed Contract or the proposed Cure Costs associated with its Assumed Contract shall file and serve on (i) the Debtors; (ii) the

attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Gary T. Holtzer, Esq., Robert J. Lemons, Esq., and Charles M. Persons, Esq.); (iii) the attorneys for the Administrative Agent, Baker & McKenzie LLP, 452 Fifth Avenue, New York, NY 10018 (Attn: James Donnell, Esq., Peter Goodman, Esq., and Frank Grese, Esq.); and (iv) the attorneys for the Stalking Horse Purchaser, Locke Lord LLP, 600 Travis, Suite 2800, Houston, Texas 77002 (Attn: Elizabeth M. Guffy, Esq.) or Successful Bidder (if the objection is filed after an Auction) (collectively, the "**Notice Parties**") any objections to (a) the proposed assumption, assignment, and sale of the Assumed Contracts (and must state in its objection, with specificity, the legal and factual basis thereof) and (b) if applicable, the proposed Cure Costs (and must state in its objection, with specificity, what Cure Costs are required with appropriate documentation in support thereof) no later than **March 13, 2017 at 4:00 p.m. (prevailing Central Time)** (the "**Assumption and Assignment Objection Deadline**").

c.     If a counterparty to an Assumed Contract files a timely objection asserting a higher Cure Cost than the Cure Costs set forth in the Notice of Assumption and Assignment, and the parties are unable to consensually resolve the dispute prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing.  All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under the Contract, if it is ultimately designated an Assumed Contract, will be heard at the Sale Hearing.

d.     If no objection is timely filed and served, the counterparty to an Assumed Contract shall be deemed to have consented to the assumption, assignment, and sale of the Assumed Contract to the applicable Successful Bidder(s) and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale, except with respect to the ability of any Successful Bidder(s) to provide adequate assurance of future performance. Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised prior to the Sale Hearing and will be resolved at the Sale Hearing.  The Cure Costs set forth in the Notice of Assumption and Assignment shall be controlling, notwithstanding anything to the contrary in any Assumed Contract, or any other document, and the counterparty to the Assumed Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors or the Successful Bidder(s), or the property of any of them.

30.     The Debtors also request that the Court approve the following procedures with respect to certain rights that could be asserted in connection with objections to the proposed sale:

a.      If any person asserts that any property or right (including an Assumed Contact) cannot be transferred, sold, assumed, and/or assigned free and clear of all liens, encumbrances, claims and other interests on account of the alleged termination of the Debtors' rights in such property or under such agreement or one or more alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights, then such person shall file with the Court and serve a notice on the Notice Parties with all supporting documentation (a "**Rights Notice**") on or before **March 6, 2017 at 4:00 p.m. (prevailing Central Time)** (the "**Rights Notice Deadline**").  Each Rights Notice must identify the properties or rights that are subject to such alleged right, identify the type of right(s) claimed by such party, identify the agreement, document, or statute giving rise to such right, and identify the portion of the agreement, document, or statute giving rise to such right.  The assertion of a Rights Notice shall not require an exercise of the underlying right asserted.

b.      Any person failing to timely file and serve a Rights Notice shall be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title and interest in, to and under the properties to be sold, assumed and/or assigned pursuant to the Stalking Horse Agreement or a definitive agreement for any alternative transaction (as applicable), including, without limitation, any alleged termination, approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights with respect to the Debtors' transfer, sale, assumption, and/or assignment of the Debtors' right, title and interest in, to and under such property or agreement, as set forth in the Stalking Horse Agreement or such other definitive agreement for any alternative transaction (if applicable), and (ii) deemed to consent to and approve of the transfer, sale, assumption, and/or assignment of such right, title and interest in, to and under such property or agreement, free and clear of all liens, encumbrances, claims and other interests (regardless of whether such consent must be in writing).

c.      If any person timely files and serves a Rights Notice in accordance with this Order, the Debtors and other parties in interest shall have the opportunity to object to any alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights

asserted by such Person by filing an objection to such Rights Notice at any time prior to the Sale Hearing.  Upon the filing of such objection to the Rights Notice, any rights asserted shall be deemed to be disputed and the Debtors shall be entitled to assert a bona fide dispute exists as to such rights asserted.  Nothing herein shall be deemed to be a waiver of any rights of the Debtors to contest any rights asserted by any Person in Rights Notices; all such rights of the Debtors are expressly preserved.

31.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

32.     In connection with the Sale Transaction, the Debtors will assume and assign only the Assumed Contracts pertaining to the sale.  The Debtors' assumption of the particular Assumed Contracts will be contingent upon payment of Cure Costs and effective only upon the closing of the proposed purchase.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors will, therefore, be relieved from any liability for any breach of an Assumed Contract after assignment to the Successful Bidder.  As such, the assumption of the Assumed Contract constitutes an exercise of the Debtors' sound business judgment.

33.     Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts that will be assumed be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court, and serve on each counterparty to a Contract, a copy of the Notice of

Assumption and Assignment indicating the Debtors' calculation of the Cure Costs for each such contract.  Assumed Contract counterparties will have the opportunity to file any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, to the proposed Cure Amount.

34.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citations omitted); *see also In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

35.     At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder(s) to perform under the applicable Assumed Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder(s) to provide adequate assurance of future performance, as required by section 365(b)(1) of the Bankruptcy Code.  Accordingly, the Debtors request that at the conclusion of the Sale Hearing, the proposed assumption and assignment of the applicable Assumed Contracts be approved.

36.     To facilitate the assumption and assignment of Assumed Contracts, the Debtors further request that the Court find all anti-assignment provisions of the applicable Assumed Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[5]

### Approval of Sale Notice Procedures

37.     Not later than two (2) business days after entry of the Bid Procedures Order, the Debtors (or their agents) shall provide notice (substantially in the form of the Sale Hearing Notice annexed as **Exhibit 3** to the Bid Procedures Order) of the Motion, the Bid Procedures, the Auction, the Assumption and Assignment Objection Deadlines, and the Sale Hearing by first-class mail upon (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the attorneys for the Administrative Agent; (iii) the Stalking Horse Purchaser; (iv) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Assets during the past 12 months; (v) all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Assets (for whom identifying information and addresses are available to the Debtors); (vi) all non-Debtor parties to the Contracts (for whom identifying information and addresses are available to the Debtors); (vii) any Governmental Authority known to have a claim in the chapter 11 cases; (viii) the Securities and Exchange Commission; (ix) the Internal Revenue Service; (x) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (xi) all of the Debtors' known creditors; and (xii) all other Persons as directed by the Court (for whom identifying information and addresses are available to the Debtors).

---

[5] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

38.     By **March 1, 2017**, the Debtors (or their agents) shall cause a summary version of the Sale Hearing Notice to be published (a) in the *Houston Chronicle*, *USA Today*, National Edition, *The Panola Watchman*, and the *Longview News-Journal* and (b) on the website established by KCC.

39.     The Debtors submit that the proposed Sale Hearing Notice, as described herein, complies fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto.  The Debtors respectfully request, therefore, that this Court approve the form of the Sale Hearing Notice and the notice procedures proposed above.

<u>**Protections as Good Faith Purchaser**</u>

40.     The Sale Transaction is subject to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he trustee, after notice and a hearing may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).  The proposed use, sale or lease of property of the estate may be approved under Bankruptcy Code § 363(b) if it is supported by sound business justification.  *See e.g. Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. at 631 ("A Bankruptcy Judge has considerable discretion in approving a §363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").  When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interest of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).   Ample business justification exists for the Sale Transaction.   Implementing the Sale Transaction will maximize recoveries to the Debtors' constituencies and will be to the benefit of all parties-in-interest.

      41.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor in the case where the sale conducted under section 363(b) of the Bankruptcy Code is later reversed or modified on appeal.   11 U.S.C. § 363(m) ("the reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.").   Section 363(m) fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'"   *Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)).

      42.    The selection of the Successful Bidder(s) will be the product of arm's-length, good faith negotiations in a competitive bidding process that has been part of a months-long process run by the Debtors and their advisors.   Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

      43.    An orderly but expeditious sale of the Assets is critical to maximizing recovery for the Debtors' stakeholders.   Pursuing the Sale Transaction in the manner set forth above represents a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and all their stakeholders.

**Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)**

44.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

45.     In order to maximize recoveries for the Debtors' stakeholders, the Debtors assert that the sale contemplated herein must be consummated as soon as practicable. Accordingly, the Debtors respectfully request that the Bid Procedures Order and Sale Order be effective immediately upon entry by the Court and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

**Notice**

46.     No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) Baker & McKenzie LLP, 452 Fifth Avenue, New York, NY 10018 (Attn: James Donnell, Esq. and Peter S. Goodman, Esq.), counsel to Wells Fargo Bank, N.A., as administrative agent under the Credit Agreement; (iv) Locke Lord LLP, 600 Travis Street, Suite 2800, Houston, TX 77002 (Attn: Elizabeth M. Guffy, Esq.), counsel to the Stalking Horse Purchaser); (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the Southern District of Texas; and (viii) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

47.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: February 10, 2017
        Houston, Texas

                             */s/ Christopher M. López*             
                             Christopher M. López (24041356)
                             WEIL, GOTSHAL & MANGES LLP
                             700 Louisiana Street, Suite 1700
                             Houston, Texas  77002
                             Telephone: (713) 546-5000
                             Facsimile:  (713) 224-9611
                             Email: chris.lopez@weil.com

                             -and-

                             Gary T. Holtzer (admitted *pro hac vice*)
                             Robert J. Lemons (admitted *pro hac vice*)
                             Charles M. Persons (admitted *pro hac vice*)
                             WEIL, GOTSHAL & MANGES LLP
                             767 Fifth Avenue
                             New York, New York  10153
                             Telephone:  (212) 310-8000
                             Facsimile:   (212) 310-8007
                             Email:  gary.holtzer@weil.com
                             Email:  robert.lemons@weil.com
                             Email:  charles.persons@weil.com

                             *Proposed Attorneys for the Debtors*
                             *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on February 10, 2017, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Christopher M. López*
Christopher M. López