IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
|  | * |  |
| In re: | * | Chapter 11 |
|  | * |  |
|  | * |  |
| AZURE MIDSTREAM | * | Case No. 17-30461 (DRJ) |
| PARTNERS, LP, *et al.*, | * |  |
|  | * |  |
| *Debtors* | * | (Jointly Administered) |
|  | * |  |

*************************************************************************

<u>BP AMERICA PRODUCTION COMPANY'S NOTICE OF PREFERENTIAL RIGHTS</u>

MAY IT PLEASE THE COURT:

BP America Production Company ("**BP America**"), as successor-in-interest to Amoco Production Company, through undersigned counsel, hereby submits this notice (the "**Notice**") of its preferential right to purchase (the "**Purchase Right**") a certain gas gathering pipeline system owned by one of the Debtors in these jointly-administered cases, Talco Midstream Assets, Ltd. ("**Talco**"), successor to Talco Gas Gathering Company.  BP America provides and files this Notice in response to decretal paragraph 22 of the Court's *Order Approving (A) Bid Procedures, (B) Procedures For Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases And Related Notices, (C) Notice Of Auction And Sale Hearing, And (D) Related Relief* [Dkt. No. 116] entered on February 23, 2017.

I.      BP AMERICA'S PREFERENTIAL RIGHTS

The agreement creating the Purchase Right is that certain contract entitled *Master Gas Gathering Agreement 29 Day Of January, 1993 By And Between Talco Gas Gathering Company And Amoco Production Company* (the "**Original Agreement**"), as amended and supplemented by (a) that certain *First Amendment To Master Gas Gathering Agreement* dated January 23, 1993 by

- 1 -

and between Talco and BP America and (b) that certain letter agreement dated July 9, 2012 by and between Talco and BP America (the Original Agreement as amended and supplemented hereafter referred to as the "**Gathering Agreement**").

Articles XXIII and XXIV of the Original Agreement describe the Purchase Right.  The latter article states:

> *Should Gatherer decide at any time to sell or in any way transfer title of any portion of the Gathering Facilities to another party, Gatherer shall, before consummating such sale or transfer, first offer Producer the right to purchase the Gathering Facilities at the same price and conditions at which Gatherer would otherwise sell or transfer to another party.  Producer's preferential right to purchase shall be exercised by written acceptance to Gatherer within forty-five (45) days after receipt by Producer of pertinent information from Gatherer regarding the sale of the Gathering Facilities and the price applicable thereto.*

Article XXIII provides in part "*If Gatherer and Producer fail to agree on a renegotiated fee, Gatherer shall sell the Gathering Facilities to Producer for $200,000.*"

The foregoing contractual provisions create not only a preferential right to purchase in favor of BP America, but also, for the reasons mentioned below, a requirement that the property in question be sold at this time to BP America by Talco for $200,000.

The property subject to the Purchase Right, *i.e.*, the Gathering Facilities, *a/k/a* The Woodlawn System, is described in the attached Exhibit 1 *in globo*, all of which were attached as Exhibits "A," "B," "D," and "F" to the Original Agreement.  The Gathering Facilities are further described in that certain letter from Talco dated February 15, 2017, and addressed to BP America. The February 15, 2017 letter with all enclosures is attached hereto as Exhibit 2.

BP America expressly reserves the right to timely exercise the Purchase Right with respect to the Gathering Facilities for the sum of $200,000, or for the fair market value of the Gathering Facilities as determined by an appraisal or valuation by a competent professional based on determination of an objective, arms' length price that would be agreed to by a willing seller and a

- 2 -

willing buyer, including evaluation of comparables and in consideration of BP America's contributions to the construction of the Gathering Facilities.

## II.      THE IMPACT OF BP AMERICA'S RIGHTS AND THE DEBTOR'S ATTEMPTS TO CIRCUMVENT THEM

Recently Talco sent to BP America the letter attached as Exhibit 2. That letter *inter alia* (a) purports to notify BP America of Talco's intention to sell the Gathering Facilities to M5 Midstream, LLC ("**M5**"), (b) suggests to BP America that M5 has offered to pay a supposed price of $23 million for the Gathering Facilities, as if such assets were being sold in a stand-alone setting, and (c) appears to inform BP America that, should it be unwilling to commit to pay an incredibly inflated price for the Gathering Facilities, presumably to match the $23 million "price" from M5, BP America will lose all rights to enforce the Purchase Right as set forth in the Original Agreement.

Talco's efforts to deprive BP America of its ability to exercise the Purchase Right by demanding BP America pay an astronomically high, supposed "purchase price" are misplaced and egregious and, moreover for several reasons, will prove detrimental to the certainty that the Gathering Facilities can and will yield for any owner of the pipeline suitable revenues in future years.

First, Talco erroneously pegs the supposed "purchase price" that BP America must offer to pay for the Gathering Facilities at $23 million. Talco blatantly ignores Article XXIII of the Original Agreement, which sets the purchase price for BP America at $200,000. That purchase price is now in effect. In the expedited motion regarding bid procedures and potential sale of assets [Dkt. No. 78] filed on February 10, 2017, the Debtors state that, in connection with its proposed sale of assets to M5, including without limitation the Gathering Facilities, they (including Talco) will assume (and assign to M5), pursuant to Section 365 of the Bankruptcy Code, only such

contracts and agreements defined as "Assumed Contracts." To date, Talco has not indicated that it will assume and assign the Gathering Agreement, implying Talco's obvious intention to attempt to reject. Rejection would suggest that Talco no longer intends to transport natural gas produced by BP America, nor will Talco otherwise pass to M5, the purported purchaser of the Gathering Facilities, any obligation to abide by the existing rates set forth in the Gathering Agreement or even to transport natural gas for BP America. BP disputes Talco's ability to reject the Gathering Agreement and does not waive its right to object to such action. Absent another explanation, these efforts of Talco appear intended solely to force BP America, a natural gas shipper who has acted in good faith and in compliance with the Gathering Agreement, into a renegotiation of the existing contract rates under conditions to be "stacked" in favor of M5 entirely through manipulation of the bankruptcy process. However, Article XXIII of the Original Agreement provides that rates can only be renegotiated (at this point in the term of the Gathering Agreement) every five years. Rates were last negotiated between Talco and BP America to become effective January 1, 2013. No further negotiation to move rates in any direction is possible until 2018. Talco's "insistence" on effecting a renegotiation of rates in favor of M5 at this time, which Talco no doubt intends to achieve by rejection of the Gathering Agreement, gives rise to BP America's right to exercise its Purchase Right at this time for $200,000, as set forth in Article XXIII of the Gathering Agreement. BP rejects Talco's attempt to cause the renegotiation of the Gathering Agreement.

Second, the "allocated" purchase price of $23 million proposed by Talco to BP America lacks all economic substance; simply put, the allocated price totally lacks any explicable relationship to the fair market value of the Gathering Facilities. Given the entire body of assets being sold by the jointly-administered Debtors, *i.e.*, pipelines, processing and treatment plants, salt water disposal wells and rights-of-way spanning eight Texas counties and two Louisiana parishes,

it is astonishing that Talco and M5 would opt to "allocate" a value of $23 million to a single pipeline system (and one where Talco has no compression facilities save for those owned by BP America) located only in Harrison County, Texas.  Indeed, the supposed "price" for this single-county pipeline is more than 15% of the total purchase price of $151,100,000 offered by M5 for all assets being offered for sale by the Debtors.  The large chasm between the purported "price" for the Gathering Facilities and fair market value is puzzling.  Talco's effort to force that unrealistic "price" on BP America is made more egregious by the actions of the Debtors (and presumably M5) to stifle the Court-approved auction.  Undersigned counsel has been advised by counsel for a prospective bidder that the Debtors have, based on confidentiality and nondisclosure agreements associated with the sale process, objected to that bidder having direct discussion with BP America regarding the Gathering Agreement.  Yet, the Debtors have apparently not imposed these restrictions on M5, which has had direct discussions with BP America.  The Debtors' actions in this regard suggest that M5 has been favored by Talco over all other bidders, which calls into question the fairness of the bidding process and whether this Court should confirm any resulting sale.[1]  BP America reserves all rights, as both a contract counterparty and potentially the largest unsecured creditor in this case, to object to the sale on these grounds.

Third, the only shipper on the Gathering Facilities BP America.  BP America will not agree to any demands of Talco, or the buyer of the pipeline (whether M5 or another party), for excessive transportation rates.  If BP America will not agree, Talco or the buyer will need to find new customers for the Gathering Facilities in short order and such customers must collectively control

---

[1] Not only have the Debtors objected to a potential bidder dealing directly with BP America, they have also indicated to the agent for the first lien lenders that they should not communicate directly with BP America.  Talco's attempts to restrict communications among interested parties is troubling enough.  The fact that Talco has, apparently, not imposed such restrictions on M5 is worse.

4584360_2.Docx

a substantial quantity of natural gas in order for the pipeline to generate sufficient operational revenues going forward.  Based on the known producers in the vicinity of the Gathering Facilities, finding such new customers is a near impossibility.  The lack of any customer other than BP America suggests that (a) the decision to reject is not based proper business judgment and (b) the portion of the purchased price allocated to this one pipeline is based on nothing more than fiction.

Fourth, the Gathering Facilities lack compression facilities, such facilities being currently owned by BP America.  If Talco is successful in causing a rejection of the Gathering Agreement under Section 365, Talco or a purchaser of the Gathering Facilities, will need to enter negotiations with BP America for either (a) acquisition of the compression facilities at a price BP America deems appropriate or (b) an agreement for use of those compression facilities at rates BP America finds adequate, or alternatively face the expenditure of millions of dollars to construct compression facilities.  The lack of access to compression, which is necessary for the functioning of the pipeline, suggests that the portion of the purchased price allocated to this one pipeline is based on nothing more than fiction.

Fifth, at this time BP America fully intends to continue tendering payments to Talco or the purchaser reflecting the current rates in effect (and as they may change from time to time) under the Gathering Agreement unless and until such rates are renegotiated pursuant to the applicable contractual provisions, and whether or not bankruptcy rejection of the Gathering Agreement ever occurs.  BP America is cognizant that at some point Talco or the purchaser might attempt to cease transportation service to BP America.  Aware of that possibility, BP America intends to fully hold the pipeline operator (whether Talco, M5 or someone else) to all requirements of Statewide Rule 73, 16 Tex. Admin Code § 3.73.  Section (c) of Statewide Rule 73 requires that a pipeline operator must file an application with the Texas Railroad Commission seeking regulatory approval

to disconnect a shipper's wells from the pipeline or to cease providing service to a shipper's wells. The filing of the application causes the scheduling of a hearing at which the Commission will take into account numerous factors in determining whether physical disconnection or allowance of cessation of pipeline service to the shipper (in this case, BP America) should even be approved. These factors include without limitation the shipper's availability of alternative transportation, the prevention of waste, the actual cost incurred by the pipeline operator in the continued operation of the physical connection or service, and the operational integrity of wells should they need to be shut in due to a cessation of pipeline service.

Sixth, if the ultimate goal of Talco or any purchaser of the Gathering Facilities is to squeeze from BP America excessive rates for the future shipment of natural gas, and given the clear anticipatory breach of the Gathering Agreement arising from threatened bankruptcy rejection, BP America expects to immediately commence a rate case with the Texas Railroad Commission pursuant to Section 81.061 of the Texas Natural Resources Code. Such rate case will serve to ensure that BP America pays, and the pipeline operator receives, for the shipment on the Gathering Facilities transportation rates that reflect market conditions, including the actual cost incurred by the operator in providing transportation service. Moreover, BP America's goal of paying fair rates will no doubt be served by the fact that necessary compression for the Gathering Facilities is owned by BP America and by several well-established regulatory principles, including the setting of rates accounting for large financial contributions by a shipper to a pipeline's construction, that legitimately offset demands of any pipeline operator for possibly excessive rates. *See, e.g., Conoco, Inc. vs. Louisiana Public Service Commission*, 520 So.2d 404, 409 (La. 1988) (in rate case, shipper must be allowed lower rate until time it has been adequately compensated for large financial contributions to construction of pipeline).

4584360_2.Docx

Finally, the future contract rates being demanded of BP America, which firmly rest on (a) Talco's attempted rejection of the Gathering Agreement and (b) the purchase of the Gathering Facilities by M5, equate to approximately **400%** of current market rates for the transportation of natural gas in the pertinent area.  Should those excessive rates be somehow wrested from BP America, the tremendous differential between the existing rates under the Gathering Agreement and the demanded rates will give rise to an extremely significant rejection claim for BP America. It is believed that such claim will dwarf other known and existing unsecured claims in the Talco Chapter 11 case and render Talco incapable of proposing in its Chapter 11 plan a meaningful payment on account of unsecured claims.

## III.     CONCLUSION

BP America Production Company requests that its Purchase Right be preserved for exercise according to the terms of the Gathering Agreement, particularly Articles XXIII and XXIV, in the amount of $200,000 for the purchase of the Gathering Facilities or such other reasonable amount as this Court may establish.  BP America reserves all rights, including the right to assert its present ownership in the Gathering Facilities.

Dated this 6th day of March, 2017.

Respectfully submitted,

LISKOW & LEWIS

By:   /s Michael D. Rubenstein

Michael D. Rubenstein
(Tex. Bar Roll No. 24047514)
1001 Fannin, Suite 1800
Houston, TX 77002
Telephone:  (713) 651-2953
Fax:  (713) 651-2908
Email:  *mdrubenstein@liskow.com*

- 8 -

**and**

Joseph P. Hebert
(ex. Bar Roll No. 24047514)
822 Harding St.
Lafayette, LA 70503
P.O. Box 52008
Lafayette, LA  70505-2008
Telephone:  (337) 232-7424
Fax:  (337) 267-2399
Email:  *jphebert@liskow.com*

*Attorneys for BP America Production Company*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing *Rights Notice Of BP America Production Company* has been filed electronically with the Clerk of Court using the CM/ECF system and a copy of this filing has been sent electronically to the following parties or counsel of record who have registered to receive electronic service:

- Christopher Manuel Lopez (chris.lopez@weil.com);
- Courtney E. Giles (Courtney.giles@bakermckenzie.com);
- Elizabeth Banda Calvo (rgleason@pbfcm.com);
- Elizabeth M. Guffy (eguffy@lockelord.com);
- Elizabeth Weller (Dallas.bankruptcy@publicans.com);
- Evan Gershbein (ECFpleadings@kccllc.com);
- Garrick Chase Smith (gsmith@velaw.com);
- Hector Duran, U.S. Trustee (Hector.Duran.Jr@usdoj.gov);
- James Donnell (James.Donnell@bakermckenzie.com);
- Jason Starks (bk-jstarks@texasattorneygeneral.gov);
- John P. Dillman (Houston_bankruptcy@publicans.com);
- Kiran A. Phansalkar (kphansalkar@cwlaw.com);
- Lee Gordon (lgordon@mvbalaw.com);
- Owen Mark Sonik (osonik@pbfcm.com);
- Patricia Williams Prewitt (pwp@pattiprewittlaw.com);
- Tab Beall (tbeall@pbfcm.com);
- Tara L. Grundemeier (Houston_bankruptcy@publicans.com);

4584360_2.Docx

and to the following via United States First Class Mail, postage prepaid and properly addressed:

Azure Midstream Partners, LP
Azure ETG, LLC
Azure Holdings GP, LLC
Azure Midstream Partners GP, LLC
Azure TGG, LLC
Marlin G&P I, LLC
Marlin Logistics, LLC
Marlin Midstream Finance Corporation
Marlin Midstream, LLC
Murvaul Gas Gathering, LLC
Talco Midstream Assets, Ltd.
Turkey Creek Pipeline, LLC
12377 Merit Drive, Suite 300
Dallas, TX 75251

Christopher Manuel Lopez
WEIL GOTSHAL MANGES LLP
700 Louisiana, Suite 1700
Houston, TX 77002

Garrick Chase Smith
VINSON & ELKINS LLP
2001 Ross Ave, Ste 3700
Dallas, TX 75201

Hector Duran
U.S. TRUSTEE
515 Rusk, Suite 3516
Houston, TX 77002

Houston, Texas, this 6th day of March, 2017.

/s/ Michael D. Rubenstein
Michael D. Rubenstein